UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

| UNITED STATES OF AMERICA, | ) | Case No. ▶▶ **CR07-01240** |
|---|---|---|
| Plaintiff, | ) | |
| | ) | I N F O R M A T I O N |
| v. | ) | |
| | ) | [18 U.S.C. § 2511(1)(c),(4)(a): |
| JOHN KENNETH SCHIEFER, | ) | Disclosure of Illegally Intercepted |
| aka acidstorm, | ) | Electronic Communications; 18 U.S.C. |
| aka acid, | ) | § 1030(a)(4),(c)(3)(A): Accessing |
| aka cnatasii, | ) | Protected Computers to Conduct |
| | ) | Fraud; 18 U.S.C. § 1344: Bank Fraud; |
| Defendant. | ) | 18 U.S.C. § 1343: Wire Fraud; |
| | ) | 18 U.S.C. § 2(b): Aiding and |
| | ) | Abetting and Causing an Act to be |
| | ) | Done] |

The United States Attorney charges:

**INTRODUCTORY ALLEGATIONS**

At all times relevant to this Information:

**ENTITIES AND INDIVIDUALS**

DEFENDANT JOHN KENNETH SCHIEFER

1.    Defendant JOHN KENNETH SCHIEFER, also known as ("aka")

"acidstorm," aka "acid," aka "cnatasii," (hereinafter "defendant

SCHIEFER") was an individual residing in Los Angeles, California,

within the Central District of California.

2.    Defendant SCHIEFER possessed at least one computer at his

MCK:CM2

1 residence and accessed the Internet from a telephone line located
2 there.

3     3.    Defendant SCHIEFER was employed as an information
4 security professional in Los Angeles, California, within the
5 Central District of California, and accessed the Internet from a
6 dedicated line located at his office.

7     4.    Defendant SCHIEFER used the following e-mail accounts:
8 acidz0r@gmail.com, acid@rizon.net, and cnatasii@gmail.com.

9     5.    Defendant SCHIEFER used the MSN instant message nickname
10 "acidstorm." Defendant SCHIEFER sometimes included messages with
11 that MSN nickname, including: "remember the name or feel the pain"
12 and "Crime pays, and it also has an excellent benefits package."

13 FINANCIAL INSTITUTIONS

14     6.    Suffolk County National Bank was a financial institution
15 the deposits of which were insured by the Federal Deposit Insurance
16 Corporation and engaged in, and the activities of which affected,
17 interstate and foreign commerce.

18 PAYPAL

19     7.    Paypal, Inc., was an online payment solutions company
20 located in San Jose, California, and operated a website located at
21 www.paypal.com.

22     8.    Paypal's service built on the existing financial
23 infrastructure of bank accounts and credit cards so that any
24 individual or business with an e-mail address could securely,
25 easily, and quickly send and receive payments online by
26 transferring or debiting existing bank accounts or credit card
27 accounts through their PayPal accounts. For example, if a Paypal
28 user linked his Paypal account to a regular checking account at a

1  bank, his Paypal purchases would cause funds to be electronically
2  transferred from that checking account to satisfy those
3  obligations.  Alternatively, if a Paypal user linked her Paypal
4  account to a credit card, her Paypal purchases would cause debits
5  to appear on her credit card statements.

6       9.   PayPal's servers operated in interstate and foreign
7  commerce and communication.

8  SIMPEL INTERNET

9       10.  Simpel Internet V.O.F was an advertising service company
10 (defined at paragraphs 13 through 16 below) located in Medemblik,
11 Netherlands.

12      11.  Simpel Internet owned and operated the web site
13 www.topconverting.com.

14      12.  Simpel Internet's computers operated in interstate and
15 foreign commerce and communication.

16 COMPUTER TERMINOLOGY

17      Advertising Service Companies

18      13.  Online merchants often hire advertising service
19 companies to send traffic to their web sites.  These advertising
20 service companies in turn maintain advertising affiliate programs,
21 whereby individuals, typically individuals who operate websites,
22 are hired to place on websites certain links advertising the
23 merchant's product or business and are then compensated based upon
24 the number of visitors to the website that click on the link.
25 These individuals are known as "affiliates."

26      14.  Some advertising service companies with multiple online
27 merchant clients compensate their affiliates each time a type of
28 software known as "adware" is successfully installed on a visitor's

3

1  computer.  Adware collects information about an Internet user to
2  display advertisements in the user's Web browser (defined at
3  paragraph 32 below) based upon information it collects from the
4  user's browsing patterns.

5    15.  Adware is usually installed on an Internet user's
6  computer only upon notice or if the user performs some action, like
7  clicking a button on a pop-up window, installing a software
8  package, or agreeing to enhance the functionality of a Web browser
9  by adding a toolbar (defined at paragraph 30 below) or an
10  additional search box.

11    16.  Advertising service companies typically identify their
12  affiliates by some type of identification number or code that is
13  included in the adware.  The advertising service companies then
14  tally up the number of installs and periodically pay the affiliate
15  based upon a percentage of the number of installs, usually through
16  Paypal, wire transfer, direct bank deposit, or by check.  For
17  example, at all times relevant to this Information, Simpel Internet
18  was an advertising service company that operated an affiliate
19  program through its website www.topconverting.com.

20    Bot

21    17.  The term "bot" is derived from the word "robot" and
22  commonly refers to a software program that performs repetitive
23  functions.  Bot also refers to a computer infected with malicious
24  software that allows a malicious computer user, commonly known as a
25  "hacker," to access or control the infected computer without
26  permission or consent.  Often, the true owner of the infected
27  computer will be unaware that his or her computer is controlled, or
28  "owned," by a hacker.

4

Botnet

18. A "botnet" typically is a network of infected computers that are used to control or attack computer systems. Botnets often are created by spreading a computer virus or worm (defined at paragraphs 33 and 34) that propagates throughout the Internet, gains unauthorized access to computers on the Internet and infects the system with a particular bot program. The bot program usually is encoded with a domain name (defined at paragraph 19 below) that the infected computer uses to find and contact a specific computer on the Internet that is hosting an Internet Relay Chat ("IRC") channel (defined at paragraph 22 below). Once the infected computer contacts, or reports to, that IRC channel, the infected computer will receive further instructions. The "botherder," that is, the person controlling the botnet, can direct the bots responding to the specified IRC channel by sending commands, or "topic," to that IRC channel. A botnet can consist of up to hundreds of thousands of infected computers. The infected or compromised computers are often referred to as "zombies" or "drones."

Domain Name Server ("DNS")

19. A "domain name" identifies where on the Internet a domain, or computer, is located. Domain names typically are easy-to-recall words or phrases as opposed to numerical Internet Protocol ("IP") addresses (defined at paragraph 21 below), which are used by computers to identify addresses on the Internet. A "domain name server" ("DNS") translates domain names to IP addresses and vice versa. Domain name servers maintain central lists of domain names and associated IP addresses. When computer

1  users look for a particular domain by inputting the appropriate
2  domain name, the computer seeks out a domain name server to
3  translate or "map" the domain name to the appropriate IP address.
4  The request is then relayed to other domain name servers on the
5  Internet until the appropriate IP address is found.

6       Internet Hosting Companies

7       20.   Internet hosting companies provide individuals or
8  businesses with large scale access to the Internet through the use
9  of computers large enough to provide one or more services to other
10 computers on the Internet.  These large computers are commonly
11 referred to as "servers."  Use of a server often is combined with
12 access to a larger network of computers.  The services of Internet
13 hosting companies enable customers to conduct activity on the
14 Internet, such as the ability to operate web sites, administer
15 networks, or run e-mail systems.

16      Internet Protocol Address

17      21.  An "Internet Protocol Address" or "IP address" is a
18 unique numeric address used by computers on the Internet.  An
19 IP address is designated by a series of four numbers, each in the
20 range 0-255, separated by periods (e.g., 63.223.68.55).  Every
21 computer connected to the Internet must be assigned an IP address
22 so that Internet traffic sent from and directed to that computer
23 may be directed properly from its source to its destination.  Most
24 ISPs control a range of IP addresses, which they assign to their
25 subscribers.  No two computers on the Internet can have the same
26 IP address at the same time.  Thus, at any given moment, an
27 IP address is unique to the computer to which it has been assigned.

28

6

Internet Relay Chat ("IRC")

22.   Internet Relay Chat or "IRC" is a network of computers connected through the Internet that allows users to communicate (or chat) with others in real time.  IRC users utilize specialized client software to use the service and can access a "channel" that is administered by one or more "operators" or "ops."  IRC channels sometimes are dedicated to a topic and are identified by a pound sign and a description of the topic such as "#miamidolphins."  IRC channels also are used to control botnets.

Internet Relay Chat Daemon ("IRCD")

23.   An Internet Relay Chat Daemon ("IRCD") is a computer program used to create an IRC server on which people can talk to each other via the Internet.

Internet Service Providers

24.   ISPs offer their customers access to the Internet using telephone or other telecommunications lines.  ISPs provide Internet e-mail accounts that allow users to communicate with other Internet users by sending and receiving electronic messages through their ISPs' servers.  ISPs remotely store electronic files on behalf of their customers, and may provide other services unique to each particular ISP.

Malware

25.   Malicious software, or "malware," is software that, among other things, allows malicious computer users to gain remote access to victim computers without authorization and collect sensitive information from those victim computers.

Operating System

26.   The operating system is the software that manages the

sharing of the resources of a computer, such as memory.   An
operating system also processes data and input from computer users.
Microsoft Windows XP is an example of an operating system.

PStore

27.   The Microsoft Windows family of operating systems offers
a service called Protected Storage or "PStore" to provide encrypted
storage for sensitive data.   Once enabled, the PStore automatically
saves in encrypted form e-mail, login, and instant messaging user
names and passwords.   The PStore also saves website digital
certificates, which are used to authenticate communications and,
therefore, ensure the security of on-line transactions.   The PStore
also saves user information so that if the computer user is
browsing the Internet using Microsoft Internet Explorer, the
browser will automatically input the user's username and password
at website prompts as a convenience to the user.

Remote Access

28.   Remote access is the ability to connect to and obtain
control over a computer over a network, often over the Internet.

Server

29.   A "server" is a centralized computer that provides
services for other computers connected to it via a network. The
other computers attached to a server sometimes are called
"clients."   In a large company, it is common for individual
employees to have client computers at their desktops.   When the
employees access their e-mail, or access files stored on the
network itself, those files are pulled electronically from the
server, where they are stored, and are sent to the client's
computer via the network.   In larger networks, it is common for

servers to be dedicated to a single task.  For example, a server that is configured so that its sole task is to support a World Wide Web site is known simply as a "web server."  Similarly, a server that hosts IRC communications is an "IRC server."

Toolbar

30.  A "toolbar" is a row or column of on-screen buttons used to activate functions in a computer program.  Toolbars used as adware or malicious code often cause advertisements to pop up on the infected user's computer.

Uniform Resource Locator ("URL")

31.  The "Uniform Resource Locator" or "URL" is the unique address that identifies a computer or web page on the Internet for routing purposes, such as http://www.cnn.com.

Web Browser

32.  A web browser is a software program that enables a computer user to display and interact with text, images, videos, music, and other information typically located on a web page at a website.  Text and images on a web page may contain links to other web pages at the same or different websites.  Web browsers allow a user to access quickly and easily information on many web pages at many websites by traversing these links.  Microsoft Internet Explorer is an example of a web browser.

Worm

33.  A "worm" is a type of malware designed to damage a computer system.  A worm needs little or no human assistance to spread.  A worm can replicate itself over a computer network and usually performs malicious actions, such as exhausting the computer's resources and possibly shutting the system down.

<u>Virus</u>

34.   A "virus" is a type of malware designed to damage a computer system.   Unlike a worm, a virus needs human assistance to spread.   For example, a virus can spread from one computer to another when a computer user sends it over the Internet.

1  **OVERVIEW OF DEFENDANT'S CRIMES**

2       36.  Beginning on an unknown date and continuing to on or

3  about January 24, 2006, defendant SCHIEFER and co-schemers known

4  and unknown to the United States Attorney engaged in a series of

5  schemes to infect protected computers throughout the United States

6  to create botnets.  Defendant SCHIEFER and his co-schemers created

7  the botnets in the following manner:

8            a.  Defendant SCHIEFER and his co-schemers would obtain

9  access to servers from Internet hosting companies.  Defendant

10 SCHIEFER and his co-schemers would then use the servers as IRC

11 servers by running IRCDs.  Defendant SCHIEFER and his co-schemers

12 would also create channels in IRC that they controlled.

13           c.  Defendant SCHIEFER and his co-schemers would also

14 develop or modify existing malware that would cause infected

15 computers, unbeknownst to the users of the infected computers, to:

16                    i.  report to the IRC channels that they controlled;

17                    ii. scan for other computers vulnerable to similar

18 infection; and

19                    iii. succumb to future unauthorized access using

20 other malware.

21           d.  Defendant SCHIEFER and his co-schemers would use the

22 servers to disseminate the malware, infect vulnerable computers

23 connected to the Internet, and cause thousands of victim computers

24 per day to report to the IRC channels that they controlled on the

25 servers.  Using this process, defendant SCHIEFER would obtain

26 control over botnets comprised of up to 250,000 infected computers

27 at a time.  Defendant SCHIEFER would control the botnets using

28 computers at his home and place of employment.

1       37.   Defendant SCHIEFER and his co-schemers would then use

2   those botnets to further a variety of criminal ends:

3        a.   Defendant SCHIEFER and his co-schemers would use

4   malware on the zombie computers to intercept electronic

5   communications being sent over the Internet from those zombie

6   computers to www.paypal.com and other websites.  Those

7   communications would then be redirected to a channel in IRC that

8   defendant SCHIEFER and his co-schemers controlled.  Defendant

9   SCHIEFER and his co-schemers would then identify victim usernames

10  and passwords in those communications and use that authentication

11  information to purchase domain names and other items.

12  Defendant SCHIEFER also would transfer the stolen usernames and

13  passwords to others for their unauthorized use.

14       b.   Defendant SCHIEFER and his co-schemers would cause

15  the zombie computers in the botnets to disgorge confidential

16  banking information, including PayPal usernames and passwords, from

17  their respective PStores by transmitting that information to IRC

18  channels that defendant SCHIEFER and his co-schemers controlled.

19  Defendant SCHIEFER would then use the stolen confidential banking

20  information to purchase domain names and other items and would

21  transfer the stolen confidential banking information to others for

22  their unauthorized use.

23       c.   Defendant SCHIEFER and his co-schemers would install

24  adware programs on the zombie computers to defraud an advertising

25  service company that believed that defendant SCHIEFER was a

26  legitimate advertising affiliate installing the programs on the

27  computers of consenting customers when, in truth and in fact, as

28  defendant well knew, defendant was installing the programs without

1  consent onto victim computers.

2         d.  Defendant SCHIEFER would use the proceeds of these

3  various schemes to begin to set up a criminal business enterprise

4  that would use bots exclusively to obtain money and property

5  through schemes to defraud as to material matters, and to obtain

6  money and property by means of material false and fraudulent

7  pretenses, representations, and promises, and the concealment of

8  material facts.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT ONE**

[18 U.S.C. § 2511(1)(c),(4)(a)]

38.   The United States Attorney hereby repeats and re-alleges all of the introductory allegations set forth in paragraphs 1 through 37 of this Information.

39.   On or about February 25, 2005, in Los Angeles County, within the Central District of California, and elsewhere, defendant SCHIEFER intentionally disclosed to another person the contents of a wire and electronic communication, knowing and having reason to know that the information was obtained through the interception of a wire and electronic communication and that the interception was illegal.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**COUNT TWO**

[18 U.S.C. §§ 1030(a)(4), (c)(3)(A); 2]

40.   The United States Attorney hereby repeats and re-alleges all of the introductory allegations set forth in paragraphs 1 through 37 of this Information.

41.   On or about December 1, 2005, in Los Angeles County, within the Central District of California, and elsewhere, defendant SCHIEFER knowingly and with intent to defraud accessed, aided and abetted, and caused others to access without authorization computers involved in interstate and foreign commerce and communication to further an intended fraud and obtain things of value, specifically, defendant SCHIEFER accessed PayPal servers using usernames and passwords stolen from the PStores of computers belonging to C.B., A.C., and others, to buy domain names without the knowledge or consent of the true owners of those accounts.

1

**COUNT THREE**

2

[18 U.S.C. § 1344(1)]

3

INTRODUCTION

4      42.   The United States Attorney hereby repeats and re-alleges

5  all of the introductory allegations set forth in paragraphs 1

6  through 37 of this Information.

7

THE FRAUDULENT SCHEME

8      43.   Beginning on an unknown date, and continuing until at

9  least on or about December 1, 2005, in Los Angeles County, within

10 the Central District of California, and elsewhere,

11 defendant SCHIEFER, together with others known and unknown,

12 knowingly and with intent to defraud executed a scheme to defraud

13 Suffolk County National Bank and other federally insured financial

14 institutions as to material matters.

15     44.   The fraudulent scheme operated in substance in the

16 following manner:  Defendant SCHIEFER and co-schemers known and

17 unknown to the United States Attorney would obtain PayPal usernames

18 and passwords from zombie computers in their botnets.  Defendant

19 SCHIEFER and his co-schemers, acting with intent to defraud, would

20 then direct PayPal to transfer funds from linked bank and credit

21 card accounts to make purchases of domain names without the

22 knowledge or consent of the true holders of those bank and credit

23 card accounts.  PayPal would then cause federally insured financial

24 institutions to deduct funds from bank accounts and to debit funds

25 against credit card accounts without the permission of the true

26 owners of those accounts.

27

THE EXECUTION OF THE SCHEME

28     45.   On December 1, 2005, in Los Angeles County, within the

16

1    Central District of California, and elsewhere, defendant SCHIEFFER
2    made a payment using the PayPal account of a victim with the
3    initials of A.C. to cause $158.53 to be fraudulently transferred
4    from A.C.'s bank account at Suffolk National Bank.

**COUNT FOUR**

[18 U.S.C. § 1343]

46.   The United States Attorney hereby repeats and re-alleges all of the introductory allegations set forth in paragraphs 1 through 37 of this Information.

SCHEME TO DEFRAUD

47.   Beginning on or about June 20, 2005, and continuing until at least on or about August 15, 2005, in Los Angeles County, within the Central District of California, and elsewhere, defendant SCHIEFER and co-schemers known and unknown knowingly and with intent to defraud, devised, participated in, and executed a scheme to defraud Simpel Internet as to material matters, and to obtain money and property from Simpel Internet by means of material false and fraudulent pretenses, representations, and promises, and the concealment of material facts.

48.   In carrying out this scheme to defraud, defendant SCHIEFER induced Simpel Internet to hire him as an advertising affiliate and to pay him to install adware on the computers of Simpel Internet customers.  Instead of acting as a legitimate affiliate, defendant SCHIEFER and co-schemers known and unknown operated a fraud by: (1) falsely representing to Simpel Internet dba topconverting.com that defendant SCHIEFER was a software developer who intended to incorporate the adware with games and other programs that he designed when, in truth and in fact, and as defendant SCHIEFER well knew, he was not a software developer but instead operated networks of compromised computers, known as botnets; (2) falsely representing to Simpel Internet that its adware would be voluntarily installed by computer users when in

truth and in fact, and as defendant well knew, defendant SCHIEFER
and co-schemers intend to install Simpel Internet adware
surreptitiously on compromised computers; (3) causing infected
computers to be directed to a server in interstate and foreign
commerce, where they automatically would install the Simpel
Internet adware without the knowledge or consent of the true owners
of the computers; (4) causing Simpel Internet to be notified of
those installations, and to credit defendant SCHIEFER for those
installations; and (5) regulating the infection of victim computers
and the installation of adware so that it appeared that the adware
was being installed legitimately.

49.   The fraudulent scheme was carried out in substance in the
following manner:

a.   On or about June 20, 2005, defendant SCHIEFER
obtained the name and URL for Simpel Internet dba Topconverting.com
from another MSN and IRC user using the nickname "Harr0."

b.   On or about June 20, 2005, defendant SCHIEFER signed
up to be an affiliate for Simpel Internet through its website
www.topconverting.com and represented that he would install adware
on customer computers only upon notice to and consent from those
customers.

c.   On or about June 21, 2005, defendant SCHIEFER falsely
told a representative of Simpel Internet dba topconverting.com that
he was a software developer and intended to incorporate Simpel
Internet's adware as a part of computer games and other software
that he developed when, in truth and in fact, as defendant well
knew, he intended to install the adware on infected computers that
he controlled without the knowledge or consent of the true owners

1  of those infected computers.

2       d.  On or about June 23, 2005, during a chat in IRC,
3  defendant SCHIEFER ordered a co-schemer using the nickname
4  "butthead" to fix the malware used to infect victim computers
5  because it was "sketching [him] out" that fewer computers were
6  being infected.

7       e.  On or about June 23, 2005, during a chat in IRC,
8  defendant SCHIEFER provided butthead with the URL to which bots
9  were directed and where the bots could download the adware used in
10  the scheme.

11       f.  On or about June 25, 2005, during a chat in IRC,
12  defendant SCHIEFER ordered butthead to download malware onto
13  computers in a consistent fashion to avoid detection, explaining,
14  "make sur ur running that dl on ur chans so we can keep the stats
15  stable."

16       g.  On or about June 29, 2005, during a chat in IRC,
17  defendant SCHIEFER advised butthead that Simpel Internet dba
18  topconverting.com was scheduled to wire its payment for the adware
19  installations to defendant SCHIEFER, and added: "I hope to shit
20  these fags pay out =\."

21                    THE EXECUTION OF THE SCHEME

22       51.  On July 15, 2005, within the Central District of
23  California and elsewhere, defendant SCHIEFER, for the purpose of
24  executing and attempting to execute the above-described scheme to
25  \\\
26  \\\
27  \\\
28

20

1  defraud, transmitted, and caused to be transmitted $14,361.55 by

2  wire from Simpel Internet in Medemblink, Netherlands, to defendant

3  in Los Angeles, California.

4

5                              THOMAS P. O'BRIEN
                               United States Attorney
6

7

8
                               CHRISTINE C. EWELL
9                              Assistant United States Attorney
                               Chief, Criminal Division
10

11                             MICHAEL ZWEIBACK
                               Assistant United States Attorney
12                             Chief, Cyber and Intellectual Property
                               Crimes Section
13

14                             WESLEY HSU
                               Assistant United States Attorney
15                             Deputy Chief, Cyber and Intellectual
                               Property Crimes Section
16

17                             MARK C. KRAUSE
                               Assistant United States Attorney
18                             Cyber and Intellectual Property Crimes
                               Section
19

20

21

22

23

24

25

26

27

28