THOMAS P. O'BRIEN
United States Attorney
CHRISTINE C. EWELL
Assistant United States Attorney
Chief, Criminal Division
MARK C. KRAUSE (SBN 198142)
Assistant United States Attorney
Cyber and Intellectual Property Crimes Section
    1200 United States Courthouse
    312 North Spring Street
    Los Angeles, California 90012
    Telephone: (213) 894-3493
    Facsimile: (213) 894-8601
    E-mail: mark.krause@usdoj.gov

Attorneys for Plaintiff
UNITED STATES OF AMERICA

FILED

UNITED STATES DISTRICT COURT

FOR THE CENTRAL DISTRICT OF CALIFORNIA

**CR07-01240**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) CR No. _____ |
| | ) |
| Plaintiff, | ) <u>PLEA AGREEMENT FOR DEFENDANT</u> |
| | ) <u>JONATHAN KENNETH SCHIEFER</u> |
| v. | ) |
| | ) |
| JONATHAN KENNETH SCHIEFER, | ) |
|     aka acidstorm, | ) |
|     aka acid, | ) |
|     aka storm, | ) |
| | ) |

1.    This constitutes the plea agreement between JONATHAN

KENNETH SCHIEFER ("defendant") and the United States Attorney's

Office for the Central District of California ("the USAO") in the

above-captioned case.  This agreement is limited to the USAO and

cannot bind any other federal, state or local prosecuting,

administrative or regulatory authorities.

PLEA

2.    Defendant gives up the right to indictment by a grand

jury and agrees to plead guilty to a four-count information in

the form attached to this agreement or a substantially similar

1 form.

2 NATURE OF THE OFFENSES

3     3.    In order for the defendant to be guilty of count one,
4 which charges a violation of Title 18, United States Code,
5 Section 2511(1)(c) and (4)(a), the following must be true:
6 (1) the defendant intentionally disclosed information to another;
7 (2) the information was obtained from an intercepted electronic
8 communication; (3) the defendant knew the information was from an
9 intercepted electronic communication; and (4) the defendant knew
10 or should have known the interception was illegal.

11     In order for the defendant to be guilty of count two,
12 which charges a violation of Title 18, United States Code,
13 Section 1030(a)(4) and (c)(3)(A), the following must be true:
14 (1) the defendant knowingly accessed without authorization a
15 computer used in interstate and foreign commerce and
16 communication; (2) the defendant did so with the intent to
17 defraud; (3) by accessing the protected computer without
18 authorization, the defendant furthered the intended fraud; and
19 (4) by accessing the protected computer without authorization,
20 the defendant obtained anything of value.

21     In order for the defendant to be guilty of count three,
22 which charges a violation of Title 18, United States Code,
23 Section 1344, the following must be true: (1) the defendant
24 knowingly executed a scheme or artifice to defraud a financial
25 institution as to a material matter; (2) the defendant did so
26 with the intent to defraud; and (3) the financial institution was
27 then insured by the Federal Deposit Insurance Corporation.

28     In order for the defendant to be guilty of count four, which

charges a violation of Title 18, United States Code, Section
1343, the following must be true: (1) the defendant knowingly
devised or knowingly participated in a scheme or artifice to
defraud as to a material matter; (2) the defendant did so with
the intent to defraud; and (3) in advancing, or furthering, or
carrying out this scheme to defraud, a writing, signal or sound
by means of wire, radio, or television communication in
interstate commerce was transmitted.

Defendant admits that he is, in fact, guilty of these
offenses as described in counts one through four of the
information.

### PENALTIES AND RESTITUTION

4.   The statutory maximum sentence that the Court can impose
for a violation of 18 U.S.C. § 2511(1)(c) and (4)(a), as charged
in count one, is: 5 years imprisonment; a three-year period of
supervised release; a fine of $250,000 or twice the gross gain or
gross loss resulting from the offense, whichever is greatest; and
a mandatory special assessment of $100.

The statutory maximum sentence that the Court can impose for
a violation of 18 U.S.C. 18 U.S.C. §§ 1030(a)(4) and (c)(3)(A),
as charged in count two, is: 5 years imprisonment; a three-year
period of supervised release; a fine of $250,000 or twice the
gross gain or gross loss resulting from the offense, whichever is
greatest; and a mandatory special assessment of $100.

The statutory maximum sentence that the Court can impose for
a violation of Title 18, United States Code, Section 1344(1), as
charged in count three, is: 30 years imprisonment; a 5-year
period of supervised release; a fine of $1,000,000 or twice the

3

gross gain or gross loss resulting from the offense, whichever is greatest; and a mandatory special assessment of $100.

The statutory maximum sentence that the Court can impose for a violation of Title 18, United States Code, Section 1343, as charged in count four, is 20 years imprisonment; a 3-year period of supervised release; a fine of $250,000 or twice the gross gain or gross loss resulting from the offense, whatever is greatest; and a mandatory special assessment of $100.

Therefore, the total maximum sentence for all offenses to which defendant is pleading guilty is: 60 years imprisonment; a 5-year period of supervised release; a fine of $1,750,000, or twice the gross gain or gross loss resulting from the offenses, whichever is greatest; and a mandatory special assessment of $400.

5.   Supervised release is a period of time following imprisonment during which defendant will be subject to various restrictions and requirements.  Defendant understands that if defendant violates one or more of the conditions of any supervised release imposed, defendant may be returned to prison for all or part of the term of supervised release, which could result in defendant serving a total term of imprisonment greater than the statutory maximum stated above.

6.   Defendant also understands that, by pleading guilty, defendant may be giving up valuable government benefits and valuable civic rights, such as the right to vote, the right to possess a firearm, the right to hold office, and the right to serve on a jury.

7.   Defendant further understands that the conviction in

4

1  this case may subject defendant to various collateral
2  consequences, including but not limited to, deportation,
3  revocation of probation, parole, or supervised release in another
4  case, and suspension or revocation of a professional license.
5  Defendant understands that unanticipated collateral consequences
6  will not serve as grounds to withdraw defendant's guilty plea.

7      8.    Defendant understands that defendant will be required
8  to pay full restitution to the victims of the offenses.
9  Defendant agrees that, in return for the USAO's compliance with
10 its obligations under this agreement, the amount of restitution
11 is not restricted to the amounts alleged in the counts to which
12 defendant is pleading guilty and may include losses arising from
13 all relevant conduct in connection with those counts.  The
14 parties currently believe that the applicable amount of
15 restitution is $19,128.35, but recognize and agree that this
16 amount could change based on facts that come to the attention of
17 the parties prior to sentencing.  Defendant further agrees that
18 defendant will not seek the discharge of any restitution
19 obligation, in whole or in part, in any present or future
20 bankruptcy proceeding.

21                          FACTUAL BASIS

22      9.   Defendant and the USAO agree and stipulate to the
23 statement of facts appended to this plea agreement as ATTACHMENT
24 A.  This statement of facts includes facts sufficient to support
25 pleas of guilty to the charges described in this agreement and to
26 establish the sentencing guideline factors set forth in paragraph
27 13 below.  It is not meant to be a complete recitation of all
28 facts relevant to the underlying criminal conduct or all facts

1   known to either party that relate to that conduct.

2                    WAIVER OF CONSTITUTIONAL RIGHTS

3        10.   By pleading guilty, defendant gives up the following

4   rights:

5             a) The right to persist in a plea of not guilty.

6             b) The right to a speedy and public trial by jury.

7             c) The right to the assistance of legal counsel at

8   trial, including the right to have the Court appoint counsel for

9   defendant for the purpose of representation at trial.  (In this

10  regard, defendant understands that, despite his pleas of guilty,

11  he retains the right to be represented by counsel -- and, if

12  necessary, to have the court appoint counsel if defendant cannot

13  afford counsel -- at every other stage of the proceeding.)

14            d) The right to be presumed innocent and to have the

15  burden of proof placed on the government to prove defendant

16  guilty beyond a reasonable doubt.

17            e) The right to confront and cross-examine witnesses

18  against defendant.

19            f) The right, if defendant wished, to testify on

20  defendant's own behalf and present evidence in opposition to the

21  charges, including the right to call witnesses and to subpoena

22  those witnesses to testify.

23            g) The right not to be compelled to testify, and, if

24  defendant chose not to testify or present evidence, to have that

25  choice not be used against defendant.

26       By pleading guilty, defendant also gives up any and all

27  rights to pursue any affirmative defenses, Fourth Amendment or

28  Fifth Amendment claims, and other pretrial motions that have been

                                 6

1  filed or could be filed.

2                    WAIVER OF DNA TESTING

3      11.   Defendant has been advised that the government has in

4  its possession the following items of physical evidence that

5  could be subjected to DNA testing:

6      Items seized during January 25, 2006 search of defendant's

7  residence and workspace

8  Defendant understands that the government does not intend to

9  conduct DNA testing of any of these items for DNA testing and

10 does not intend to conduct any further DNA testing of those items

11 or any other items.  Defendant understands that, before entering

12 a guilty pleas pursuant to this agreement, defendant could

13 request DNA testing of evidence in this case.  Defendant further

14 understands that, with respect to the offenses to which defendant

15 is pleading guilty pursuant to this agreement, defendant would

16 have the right to request DNA testing of evidence after

17 conviction under the conditions specified in 18 U.S.C. § 3600.

18 Knowing and understanding defendant's right to request DNA

19 testing, defendant voluntarily gives up that right with respect

20 to both the specific items listed above and any other items of

21 evidence there may be in this case that might be amenable to DNA

22 testing.  Defendant understands and acknowledges that by giving

23 up this right, defendant is giving up any ability to request DNA

24 testing of evidence in this case in the current proceeding, in

25 any proceeding after conviction under 18 U.S.C. § 3600, and in

26 any other proceeding of any type.  Defendant further understands

27 and acknowledges that by giving up this right, defendant will

28 never have another opportunity to have the evidence in this case,

whether or not listed above, submitted for DNA testing, or to employ the results of DNA testing to support a claim that defendant is innocent of the offenses to which defendant is pleading guilty.

### SENTENCING FACTORS

12.   Defendant understands that the Court is required to consider the factors set forth in 18 U.S.C. § 3553(a)(1)-(7), including the kinds of sentence and sentencing range established under the United States Sentencing Guidelines ("U.S.S.G." or "Sentencing Guidelines"), in determining defendant's sentence. Defendant further understands that the Sentencing Guidelines are advisory only, and that after considering the Sentencing Guidelines and the other § 3553(a) factors, the Court may be free to exercise its discretion to impose any reasonable sentence up to the maximum set by statute for the crimes of conviction.

13.   Defendant and the USAO agree and stipulate to the following applicable Sentencing Guidelines factors:

| | | | |
|---|---|---|---|
| Base Offense Level | : | 6 | [U.S.S.G. § 2B1.1(a)(2)] |
| Specific Offense Characteristics | | | |
| Loss | : | +4 | [U.S.S.G. § 2B1.1(b)(1)(C)] |
| Sophisticated Means | : | +2 | [U.S.S.G. § 2B1.1(b)(9)(C)] |
| Trafficking in unauthorized access devices | : | +2 | [U.S.S.G. § 2B1.1(b)(10)(B)(i)] |
| Intent to Obtain Personal Information | : | +2 | [U.S.S.G. § 2B1.1(b)(14)(i)] |

Adjustments

| | | | |
|---|---|---|---|
| Role Adjustment: | +2 | [U.S.S.G. § 3B1.1(c)] |
| Abuse of Trust and Special Skill | : | +2 | [U.S.S.G. § 3B1.3] |
| Use of Minor | : | +2 | [U.S.S.G. § 3B1.4] |
| Acceptance of Responsibility | : | -3 | [U.S.S.G. § 3E1.1(a), (b)] |

Defendant and the USAO reserve the right to argue that additional specific offense characteristics, adjustments, and departures under the Sentencing Guidelines are appropriate.

14.   There is no agreement as to defendant's criminal history or criminal history category.

15.   The stipulations in this agreement do not bind either the United States Probation Office or the Court.  Both defendant and the USAO are free to: (a) supplement the facts by supplying relevant information to the United States Probation Office and the Court, (b) correct any and all factual misstatements relating to the calculation of the sentence, and (c) argue on appeal and collateral review that the Court's Sentencing Guidelines calculations are not error, although each party agrees to maintain its view that the calculations in paragraph 13 are consistent with the facts of this case.

<u>DEFENDANT'S OBLIGATIONS</u>

16.   Defendant agrees that he will:

a) Plead guilty as set forth in this agreement.

b) Abide by all sentencing stipulations contained in this agreement.

c) (i) Appear for all court appearances, (ii) surrender

9

1  as ordered for service of sentence, (iii) obey all conditions of
2  any bond, and (iv) obey any other ongoing court order in this
3  matter.

4         d) Not commit any crime; however, offenses which would
5  be excluded for sentencing purposes under U.S.S.G. § 4A1.2(c) are
6  not within the scope of this agreement.

7         e) Be truthful at all times with Pretrial Services, the
8  U.S. Probation Office, and the Court.

9         f) Pay the applicable special assessments at or before
10 the time of sentencing unless defendant lacks the ability to pay
11 and submits a completed form OBD-500 to the USAO prior to
12 sentencing.

13                    THE USAO'S OBLIGATIONS

14     17.   If defendant complies fully with all defendant's
15 obligations under this agreement, the USAO agrees:

16         a) To abide by all sentencing stipulations contained in
17 this agreement.

18         b) At the time of sentencing, provided that defendant
19 demonstrates an acceptance of responsibility for the offenses up
20 to and including the time of sentencing, to recommend a two-level
21 reduction in the applicable sentencing guideline offense level,
22 pursuant to U.S.S.G. § 3E1.1, and to recommend and, if necessary,
23 move for an additional one-level reduction if available under
24 that section.

25         c) Not charge defendant with aggravated identity theft
26 in violation of 18 U.S.C. § 1028A in connection with the scheme
27 described in the statement of facts at Attachment A.

28

## BREACH OF AGREEMENT

18.   If defendant, at any time after the execution of this agreement, knowingly violates or fails to perform any of defendant's obligations under this agreement ("a breach"), the USAO may declare this agreement breached.  If the USAO declares this agreement breached at any time between the execution of this agreement and defendant's sentencing on a non-custodial sentence or surrender for service on a custodial sentence, and the Court finds such a breach to have occurred, defendant will not be able to withdraw defendant's guilty pleas, and the USAO will be relieved of all of its obligations under this agreement.  If the USAO declares this agreement breached at any time after defendant's sentencing on a non-custodial sentence or surrender for service on a custodial sentence, and the Court finds such a breach to have occurred, the USAO will be relieved of all of its then-remaining obligations under this agreement.

19.   Following a knowing and willful breach of this agreement by defendant, should the USAO elect to pursue any charge that was either dismissed or not filed as a result of this agreement, then:

a) Defendant agrees that any applicable statute of limitations is tolled between the date of defendant's signing of this agreement and the commencement of any such prosecution or action.

b) Defendant gives up all defenses based on the statute of limitations, any claim of pre-indictment delay, or any speedy trial claim with respect to any such prosecution, except to the extent that such defenses existed as of the date of defendant's

1  signing this agreement.

2          c) Defendant agrees that: (i) any statements made by
3  defendant, under oath, at the guilty plea hearing; (ii) the
4  stipulated factual basis statement in this agreement; and
5  (iii) any evidence derived from such statements, are admissible
6  against defendant in any future prosecution of defendant, and
7  defendant shall assert no claim under the United States
8  Constitution, any statute, Rule 410 of the Federal Rules of
9  Evidence, Rule 11(f) of the Federal Rules of Criminal Procedure,
10 or any other federal rule, that the statements or any evidence
11 derived from any statements should be suppressed or are
12 inadmissible.

13          LIMITED MUTUAL WAIVER OF APPEAL AND COLLATERAL ATTACK

14     20.  Defendant gives up the right to appeal any sentence
15 imposed by the Court, including any order of restitution, and the
16 manner in which the sentence is determined, provided that (a) the
17 sentence is within the statutory maximum specified above and is
18 constitutional, (b) the Court in determining the applicable
19 guideline range does not depart upward in offense level or
20 criminal history category and determines that the total offense
21 level is 19 or below, and (c) the Court imposes a sentence within
22 or below the range corresponding to the determined total offense
23 level and criminal history category.  Defendant also gives up any
24 right to bring a post-conviction collateral attack on the
25 convictions or sentence, including any order of restitution,
26 except a post-conviction collateral attack based on a claim of
27 ineffective assistance of counsel, a claim of newly discovered
28 evidence, or an explicitly retroactive change in the applicable

                                  12

1 Sentencing Guidelines, sentencing statutes, or statutes of
2 conviction.  Notwithstanding the foregoing, defendant retains any
3 ability defendant has to appeal the Court's determination of
4 defendant's criminal history category and the conditions of
5 supervised release imposed by the Court, with the exception of
6 the following: conditions set forth in General Orders 318 and 01-
7 05 of this Court; the drug testing conditions mandated by 18
8 U.S.C. §§ 3563(a)(5) and 3583(d); and the alcohol and drug use
9 conditions authorized by 18 U.S.C. § 3563(b)(7); and the computer
10 related conditions listed below at paragraphs 22 through 24.

11     21.   The USAO gives up its right to appeal the sentence,
12 provided that (a) the Court in determining the applicable
13 guideline range does not depart downward in offense level or
14 criminal history category, (b) the Court determines that the
15 total offense level is 19 or above, and (c) the Court imposes a
16 sentence within or above the range corresponding to the
17 determined total offense level and criminal history category.

18                    COMPUTER RELATED CONDITIONS

19     22.   Defendant shall not possess or use a device with access
20 to any online service at any location without the prior approval
21 of the Probation Officer.  This includes access through any
22 Internet service provider, bulletin board system, or any public
23 or private computer network system.  Further, defendant shall not
24 have another individual access the Internet on defendant's behalf
25 to obtain files or information that defendant is restricted from
26 accessing personally, or accept restricted files or information
27 from another person;

28     23.   Defendant shall use only those computers, computer-

                              13

related devices, screen/user names, passwords, e-mail accounts, and Internet Service Providers (ISPs) approved by the Probation Officer.  Computer and computer-related devices include, but are not limited to, personal computers, personal data assistants (PDAs), Internet appliances, electronic games, and cellular telephones, as well as peripheral equipment, that can access, or can be modified to access, the Internet, electronic bulletin boards, other computers, or similar media.  Defendant shall use any approved computers only within the scope of his employment. Defendant shall not access a computer for any other purpose. Defendant shall immediately report any changes in defendant's employment affecting defendant's access and/or use of computers or the Internet, including e-mail;

24.  All computers, computer-related devices, computer storage media, and peripheral equipment used by defendant shall be subject to search and seizure, and subject to the installation of search and/or monitoring software and/or hardware, including unannounced seizure for the purpose of search.  Defendant shall not add, remove, upgrade, update, reinstall, repair, or otherwise modify the hardware or software on any computers, computer-related devices, or peripheral equipment without the prior approval of the Probation Officer, nor shall defendant hide or encrypt files or data.  Further, defendant shall, as requested by the Probation Officer, provide all billing records, including telephone, cable, Internet, satellite, and similar records.

<u>RESULT OF VACATUR, REVERSAL OR SET-ASIDE</u>

25.  Defendant agrees that if any count of conviction is vacated, reversed, or set aside, the USAO may: (a) ask the Court

14

1 to resentence defendant on any remaining counts of conviction,
2 with both the USAO and defendant being released from any
3 stipulations regarding sentencing contained in this agreement,
4 (b) ask the Court to void the entire plea agreement and vacate
5 defendant's guilty pleas on any remaining counts of conviction,
6 with both the USAO and defendant being released from all of their
7 obligations under this agreement, or (c) leave defendant's
8 remaining convictions, sentence, and plea agreement intact.
9 Defendant agrees that the choice among these three options rests
10 in the exclusive discretion of the USAO.

11                          COURT NOT A PARTY

12     26.   The Court is not a party to this agreement and need not
13 accept any of the USAO's sentencing recommendations or the
14 parties' stipulations.  Even if the Court ignores any sentencing
15 recommendation, finds facts or reaches conclusions different from
16 any stipulation, and/or imposes any sentence up to the maximum
17 established by statute, defendant cannot, for that reason,
18 withdraw defendant's guilty pleas, and defendant will remain
19 bound to fulfill all defendant's obligations under this
20 agreement.  No one -- not the prosecutor, defendant's attorney,
21 or the Court -- can make a binding prediction or promise
22 regarding the sentence defendant will receive, except that it
23 will be within the statutory maximum.

24                      NO ADDITIONAL AGREEMENTS

25     27.   Except as set forth herein, there are no promises,
26 understandings or agreements between the USAO and defendant or
27 defendant's counsel.  Nor may any additional agreement,
28 understanding or condition be entered into unless in a writing

1  signed by all parties or on the record in court.

2              PLEA AGREEMENT PART OF THE GUILTY PLEA HEARING

3      28.   The parties agree and stipulate that this Agreement

4  will be considered part of the record of defendant's guilty plea

5  hearing as if the entire Agreement had been read into the record

6  of the proceeding.

7      This agreement is effective upon signature by defendant and

8  an Assistant United States Attorney.

9  AGREED AND ACCEPTED

10 UNITED STATES ATTORNEY'S OFFICE
   FOR THE CENTRAL DISTRICT OF CALIFORNIA

11

   GEORGE S. CARDONA
12 United States Attorney

13 _____          ___11/8/07___
                                        Date
14 MARK C. KRAUSE
   Assistant United States Attorney
15

16     I have read this agreement and carefully discussed every

17 part of it with my attorney.  I understand the terms of this

18 agreement, and I voluntarily agree to those terms.  My attorney

19 has advised me of my rights, of possible defenses, of the

20 Sentencing Guideline provisions, and of the consequences of

21 entering into this agreement.  No promises or inducements have

22 been made to me other than those contained in this agreement.  No

23 one has threatened or forced me in any way to enter into this

24

25

26

27

28

                                  16

agreement.  Finally, I am satisfied with the representation of my
attorney in this matter.

_____          ___11/6/10 7___
JOHN KENNETH SCHIEFER                       Date
Defendant

     I am John Kenneth Schiefer's attorney.  I have carefully
discussed every part of this agreement with my client.  Further,
I have fully advised my client of his rights, of possible
defenses, of the sentencing factors set forth in 18 U.S.C.
§ 3553(c), including the relevant Sentencing Guidelines
provisions, and of the consequences of entering into this
agreement.  To my knowledge, my client's decision to enter into
this agreement is an informed and voluntary one.

_____          ___Nov 6 , 2007___
ARTHUR H. BARENS                            Date
Counsel for Defendant
JOHN KENNETH SCHIEFER

**ATTACHMENT A**

Defendant resided and worked in Los Angeles County, within the Central District of California.  Defendant accessed the Internet from telephone lines at his home and at his workplace at 3G Communications, a computer security firm.  Defendant used the following email accounts: acidz0r@gmail.com, acid@rizon.net, and cnatasii@gmail.com.  Defendant also used the nicknames "acidstorm," "acid" and "storm."

Beginning on an unknown date, and continuing to January 25, 2006, defendant and co-schemers known and unknown knowingly and intentionally, and through the use and transmission of malicious code, gained unauthorized access to thousands of computers used in interstate and foreign commerce and communication. Specifically, defendant and co-schemers known and unknown obtained access to servers from various Internet hosting companies.  Defendant and his co-schemers then used at least one of them as an Internet Relay Chat ("IRC") server, and created channels in IRC, which defendant and his co-schemers controlled. Defendant and his co-schemers then used other servers he controlled to transmit malicious code to scan for and exploit vulnerable computers connected to the Internet, causing thousands of protected computers to rally or be directed to a channel in IRC that defendant controlled, to scan for other computers vulnerable to similar infection, and to remain vulnerable to further unauthorized accesses, including to facilitate the theft of banking information and other personal identifying information.  These infected computers are called "bots," and the armies of bots defendant and his co-schemers controlled are known as "botnets.

*Transfer of Information Obtained by Wiretap*

Beginning no later than January 20, 2005, defendant and his co-schemers installed malicious computer code, known as malware, on infected computers that captured communications as they were sent from users' computers.  Specifically, defendant would direct infected computers to servers containing the malware, which defendant and his co-schemers called a "spybot," which acted as a HTTP sniff.  Once there, the HTTP sniff malware would be automatically downloaded onto the infected computers.  Because users would be unaware that their computers had become infected and were bots, they would continue to use their computers to engage in commercial activities.  The HTTP sniff malware would therefore intercept web communications between user computers and various websites, including websites belonging to financial institutions.  Defendant and his co-schemers did not have the

1

consent of the parties to those communications to intercept or record any of those communications. In addition, at the time that defendant and his co-schemers used the HTTP sniff to intercept the information, defendant and his co-schemers knew that they did not have permission to intercept or record those electronic communications. Defendant and his co-schemers further knew and had reason to know that the interceptions were illegal.

Once in possession of those intercepted communications, defendant and co-schemers known and unknown would sift through the data to obtain PayPal information, namely usernames and passwords, as well as usernames and passwords for other on-line accounts. Defendant would then use that information to engage in a scheme to defraud the banks where those individual users held accounts. Defendant transferred what he called "PayPals" to a co-schemer using the nickname "Adam." In transferring the information, defendant advised "Adam" to use the information to look into the accounts to determine the account balances. When "Adam" expressed concern about stealing the money, defendant advised "Adam" that "Adam" was not yet 18 and that he should just "quit being a bitch and claim it."

For example, on or about January 20, 2005, defendant and his co-schemers used the HTTP sniff to intercept electronic communications of victims with the initials of Y.D., L.B., N.S., and A.B., and others. The communications included usernames and passwords belonging to Y.D., L.B., N.S., and A.B., as well as others. Y.D., L.B., N.S., and A.B. did not consent to defendant intercepting their communications.

Later, on February 12, 2005, defendant transferred the intercepted communications belonging to victims Y.D., L.B., N.S., and A.B. to a co-schemer using the nickname "revolt." Once again, the intercepted communications included usernames and passwords belonging to Y.D., L.B., N.S., and A.B., as well as others. When defendant transferred the information, defendant knew that it was the result of intercepted communications. Defendant further knew and had reason to know that the underlying interception was illegal.

*Theft of Information from Pstore*

During that same time period, defendant and co-schemers known and unknown also installed malware on infected computers

2

that obtained information from the PStore of infected computers.[1]
Once installed, that malware, which defendant and his co-schemers
called a "psniffer," would collect information from the Pstore of
the infected computers.  Thereafter, the bots would communicate
with servers controlled by defendant and his co-schemers to
transmit the contents of the Pstore to those servers.  Through
this process, defendant was able to obtain the usernames and
passwords for PayPal accounts belonging to individual victims.
Defendant did so knowing that he did not have the permission or
authority to install the psniffer and that what he was doing was
illegal.

For example, on December 1, 2005, defendant accessed
information contained in the Pstore of the computer belonging to
a victim with the initials "A.C."  Defendant did so to and in
fact obtained A.C.'s PayPal username and password, which had
value as a means to obtain funds from A.C.'s bank account.

*Bank Fraud Scheme*

Using the information stolen through the use of bots in the
schemes described above, defendant engaged in a scheme to defraud
financial institutions as to a material matter.

Using the PayPal usernames and passwords collected with
malware, defendant would access the PayPal accounts of individual
users.  Defendant would then cause transfers of funds from the
individual users' bank accounts by making purchases using their
PayPal accounts.  At no time did defendant have the authority or
permission to make those purchases or transfers.

---

[1] Many computers use a computer program called Internet
Explorer to navigate the Internet and access websites.  As a
convenience to users, Internet Explorer features an Auto-Complete
feature in which the program recognizes when a user is inputting
a particular username or password for a particular website and
will automatically complete that username or password.  The
Windows operating system offers a service called the Protected
Store or "PStore" to provide encrypted storage for that sensitive
data.  Once enabled, PStore automatically saves in encrypted form
those user names and passwords, as well as web site digital
certificates and other IE Auto-Complete information.  Even though
items in PStore are encrypted, access to those items is
indirectly controlled by the computer user's own operating system
login credentials.  Unfortunately, PStore information is often
vulnerable to malware that is coded to gain access privileges
equal to or greater than that of the computer user.

For example, on December 5, 2005, defendant used A.C.'s username and password to purchase domain names from Dynadot, a domain name registrar. At no time did A.C. give defendant consent to use his username or password, or to transfer A.C.'s money using A.C.'s PayPal account. In executing this transaction, defendant caused funds to be fraudulently transferred from Suffolk National Bank, a financial institution the deposits of which were at all relevant times insured by the Federal Deposit Insurance Corporation and whose activities affected interstate and foreign commerce.

## Wire Fraud Scheme to Defraud Simpel Internet

During this same time period, defendant also engaged in a scheme to defraud internet advertising companies.

Online merchants often hire advertising service companies to send traffic to their web sites. These advertising service companies in turn maintain advertising affiliate programs, whereby an individual, typically someone who operates a website, is hired to place on the website certain links advertising the merchant's product or business, and is then compensated based upon the number of visitors to the website that click on the link. Some advertising service companies with multiple online merchant clients compensate their affiliates each time a type of software known as "adware" is successfully installed on a visitor's computer. Adware collects information about an Internet user in order to display advertisements in the user's Web browser based upon information it collects from the user's browsing patterns. Adware is usually installed on an Internet user's computer only upon notice or if the user performs some action, like clicking a button on a pop-up window, installing a software package, or agreeing to enhance the functionality of a Web browser.

On June 20, 2005, defendant conspired and agreed with other nefarious computer users nicknamed "pr1me" and "dynamic" to knowingly and intentionally, and through the use and transmission of malicious code, gain unauthorized access to computers used in interstate and foreign commerce and communication. Defendant, pr1me and dynamic did so with the intent to obtain money from Simpel Internet by fraud.

Also on June 20, 2005, defendant enrolled as an affiliate of Topcoverting.com, a company owned by Simpel Internet, and obtained an affiliate identification number for the purpose of receiving compensation for adware installations. In doing so, defendant represented that he would install adware only after

4

receiving consent from the owners of the computers.

Defendant also obtained Topconverting.com's adware program. Defendant falsely told representatives of Topconverting.com that he was a software developer and planned to combine Topconverting.com's adware with games and other software that defendant developed and that "customers" would voluntarily download Topconverting.com's adware when they installed defendant's games and other software. Instead, defendant, Pr1me and dynamic would install adware they obtained from Topconverting.com without permission. The adware would be surreptitiously installed without notice to, or requiring any action from, an infected computer's user. At the same time, the adware appeared to Topconverting.com to be legitimately installed.

In furtherance of the scheme, defendant, Pr1me and dynamic obtained access to servers from Internet hosting companies. Defendant, Pr1me and dynamic used at least one of them as an IRC server, and created channels in IRC which they controlled. Defendant, Pr1me and dynamic used other servers to which they had access to host the malicious adware.

Defendant, Pr1me and dynamic then transmitted malicious code to vulnerable computers connected to the Internet, causing the computers once infected to report to the IRC channel they controlled, thereby creating a botnet. Thereafter, defendant, Pr1me and dynamic caused the infected computers in the botnet to download the adware.

To avoid detection by the employees of Simpel Internet, defendant directed Pr1me and dynamic to maintain a level rate of installations so that it appeared the installations were legitimate, the result of voluntary choices by computer users, and not the result of a malicious computer program that was propagating itself. When Simpel Inernet became suspicious of the scheme, defendant reiterated that he was a computer programmer and was lawfully installing the adware.

Defendant earned approximately $19,128.35 in proceeds generated from his surreptitious installation of modified adware on protected computers he accessed without authorization. For example, for the period beginning June 1, 2005, and ending on June 30, 2005, defendant received $14,361.55 from Simpel Internet for surreptitious installations on the approximately 110,489 protected computers defendant, pr1me and dynamic accessed without authorization through the transmission of malicious code. For the period beginning July 1, 2005, and ending on July 31, 2005,

defendant received $4,766.80 from Simpel Internet for
surreptitious installations on the approximately 37,496 protected
computers defendant, pr1me and dynamic accessed without
authorization through the transmission of malicious code.

<u>CERTIFICATE OF SERVICE</u>

I, **SUSAN M. CRUZ,** declare:

That I am a citizen of the United States and resident or employed in Los Angeles County, California; that my business address is the Office of United States Attorney, United States Courthouse, 312 North Spring Street, Los Angeles, California 90012; that I am over the age of eighteen years, and am not a party to the above-entitled action;

That I am employed by the United States Attorney for the Central District of California who is a member of the Bar of the United States District Court for the Central District of California, at whose direction I served a copy of: **PLEA AGREEMENT FOR DEFENDANT JONATHAN KENNETH SCHIEFER**

**service was:**

[] Placed in a closed envelope, for collection and interoffice delivery addressed as follows:

[✓] Placed in a sealed envelope for collection and mailing via United States Mail, addressed as follows:

[] By hand delivery addressed as follows:

[] By facsimile as follows:

[] By messenger as follows:

[] By federal express as follows:

**ARTHUR BARENS, ESQ.**
**10209 SANTA MONICA BLVD.**
**LOS ANGELES, CA 90067**

This Certificate is executed on **November 9, 2007,** at Los Angeles, California.

I certify under penalty of perjury that the foregoing is true and correct.

SUSAN M. CRUZ